AMBROSE W. CRAIN AND OTHERS v. NEWELL W. CRAIN AND OTHERS.

It has been settled by repeated decisions, that the District Court is the proper tribunal to take cognizance of, and afford relief in, cases where fraud against their rights is charged by persons interested in an estate, and especially where there is a fraudulent collusion and combination between administrators and third parties in derogation, and to the injury, of those rights.

The District Court is the proper tribunal to take cognizance of a suit by forced heirs to set aside conveyances alleged to have been made by their deceased parent in fraud of their rights.

As to the other ground, that the action is premature, the succession not being closed, it is only necessary to say that the administratrix is a trustee, acting for the benefit of creditors and distributees, and that in cases where she will not or cannot act for the protection and preservation of the estate, the cestui que trusts have a right to act in the behalf, and for the protection of, their eventual interests, and that such rights are the proper subjects of judicial cognizance.

See this case as to forced heirship before the Act of 1840.

It then appears, that by our former laws, and up to 1840, a parent could not, unless for just cause of disinherison, exclude a child by any voluntary donation in his life time, to strangers, or by excessive donations to one or more of his children ; nor could he, by dispositions of this character, in his last will

Crain v. Crain.

deprive his children of a certain share (fixed by law) in his estate. Neither in life nor at death, could he exclude them from their legitimate portion.

These provisions were retained but in part in the law of 1840. No restrictions were, by that law, imposed on the power of disposing of property by donation during the life of the owner ; or, in other words and more accurately, by donations *inter vivos*. The restraints on the power of the owner to dispose of his property at pleasure, embrace only wills and donations in last sickness.—By these he cannot bequeath more than one-fourth of his property away from his children. But, as his right of disposition is not otherwise infringed for the benefit of his heirs, he may, in life, dispose freely of his property by donation, although the property may be thereby so squandered as to leave nothing for his heirs at his death, or to be disposed of by his will.

But the rights secured to heirs, by the Statute, were intended to be substantial benefits, not to be evaded by shifts or devices, or donations, whether in fact or in form, which are intended and do operate as mere frauds on the law and on the rights of heirs under the law, and are such as to allow a man the control and benefits of his property during his life, and to pass the property to a particular heir or stranger after his death, to the defeat of the rights which an heir could claim as against the will of the deceased ; and which, in fact, are but a will in disguise, without being subjected to the restrictions on dispositions by will.

Our system, with reference to the rights of forced heirs, as against inofficious testamentary bequests, is more analogous to that of the custom of London, than to any other which has been suggested, and with propriety we may refer to the decisions on the rights of heirs under that custom, not as binding authority, but as the opinions and reasonings of Judges distinguished for learning and ability, on questions of the like character with the one under consideration.

Although the parent has the unlimited power of disposition of his property by donation during his life, or, more accurately speaking, by donation *inter vivos*, provided he entirely divests himself of the property, delivering it up, with the securities of title, to the donee, and the latter goes into the actual possession, enjoyment and control, during the life of the donee, receiving the rents and profits for his own benefit ; yet, if the donor be not divested in fact, but retain the securities or property in his possession, enjoyment or control, and if the property did not, in fact and substance, whatever may be the form, vest in the donee during the life of the parent, but only after his death, such donation is void, as in fraud of the rights of forced heirs, except to the extent of the portion disposable by will.

Appeal from Nacogdoches. Heard below before the Hon. Archibald W. O. Hicks.

*Henderson & Jones*, and *R. S. Walker*, for appellants.

*T. J. Jennings*, for appellee.

HEMPHILL, CH. J.   The appellants, who were plaintiffs be-
low, represent that one Ambrose Crain departed this life on
— day of November, 1850, leaving the said Ambrose H., the
said Emily N., and the said Patience, who are plaintiffs, as
also the defendants Newell W. Crain and Jowell B. Crain, his
legitimate children and heirs at law ; that for many years be-
fore his death, and as petitioners believe at his death, the said
Ambrose owned and possessed a large amount of property,
real and personal, particularly described in exhibits A and B,
made a part of the petition, (the exhibit A being copies of
deeds of conveyance and bills of sale from the said Ambrose
to the said Newell B. Crain, and B being a copy of the inven-
tory of the estate ;) that before the death of the said Ambrose
Crain, deceased, he had made no advancements or gifts to the
petitioners, except that to said Patience he had in his life time
given property to the amount of one hundred and thirty-two
50-100 dollars ; to the said Ambrose H., property estimated
at one thousand and eighty dollars ; and to the said Emily
property and cash amounting to thirteen hundred and seventy
dollars ; that the said Ambrose Crain, being old and infirm in
body and mind, in feeble and exceedingly precarious health,
contemplating his death as being near at hand, being in the
last stages of a lingering disease which for a period of two
years had threatened his dissolution, and the said Ambrose
fraudulently and unlawfully intending, during all that period,
to defraud the petitioners out of their legal rights as forced
heirs to their portions of his estate, confederated with the said
Newell W. Crain, to the end that petitioners, at his death,
should be defrauded of their lawful inheritance, and that the
said Newell, by means of such fraudulent combination, should,
at his death, have and hold the whole property set forth in

Crain v. Crain.

the conveyances and bills of sale ; and the said Ambrose, dec'd, so combining and confederating, did, on the days of the dates of the several deeds, conveyances and contracts, convey to the said Newell W. Crain property specifically enumerated and amounting in the aggregate value to about twenty-four thousand dollars, constituting nearly the entire mass of the property of the deceased, his inventory presenting but a beggarly account of trifling articles and a few small, hopeless claims in favor of the estate. And the petitioners further represented that the said Ambrose Crain, deceased, did, notwithstanding such deeds and conveyances, retain the use and possession of all of said property, and enjoy the fruits and revenues arising therefrom, continuously to the time of his death ; and that the deeds, &c., were drawn with the full understanding and intention between the parties, that they should have no effect or operation during the life time of the said Ambrose, dec'd, but to all intents and purposes were to have the effect and operation, as between them, of a will, or of deeds to defraud the rights of the petitioners in contemplation of death, and to avoid the laws of the State ; and that all of said deeds, contracts, &c., were secretly made and entered into between the said Ambrose, dec'd, and the said Newell ; that the same were not placed on record until after the death of said Ambrose, dec'd, and were then so recorded to deter the heirs of said Ambrose, dec'd, and any administrator on his estate, from rendering in said property in the inventory.

The plaintiffs charge that there was no actual *bona fide* delivery of said property to said Newell by the said Ambrose, dec'd ; and that if there was any delivery, the same was fictitious, nominal and fraudulent ; made with the express understanding that the said Ambrose did not, and should not, part with the actual possession and control of said property, and that it was for the mere purpose of giving an apparent legal sanction to the unlawful contracts between the said parties.

The petitioners represent that to give to the contracts be-

tween the said Ambrose and the said Newell the color and ap-
pearance of being *bona fide* business transactions, the said
Newell fraudulently executed his notes to said Ambrose, dec'd,
in consideration of the said pretended sales, and with the col-
lusive and fraudulent agreement that they were to be wholly
void, to be paid neither to the said Ambrose nor to his admin-
istrator ; and that the said Ambrose, dec'd, together with the
said Newell, induced Mary Crain, the wife of said Ambrose,
and as such entitled to letters of administration, to co-operate
in the fraudulent design of not enforcing the collection of said
notes.

It is further alleged that the said Ambrose died about the
10th Nov., 1850 ; that the said Mary Crain neglected to take
out letters of administration, but finally took them out at the
instance of the said Newell, and combining and confederating
with him to give effect to the said fraudulent contracts be-
tween the said Newell and the said Ambrose, failed to render
the said notes in the said inventory, and surrendered the same
to the said Newell, without his paying or discharging the
same.

There are numerous other allegations in the petition, and
one of which emphatically re-asserts the possession, by the
deceased, of the property up to the time of his death ; that the
whole of the transactions were fraudulent in their inception
and consideration, and were contrivances under cover of seem
ingly *bona fide* sales, to select his favorite child Newell as his
sole heir, in fraud of the rights of plaintiffs as forced heirs to
a portion of the estate ; that the said Mary, as administratrix
of the deceased, has refused to sue for said property or to claim
the same ; that since the death of the said Ambrose, the said
Newell has taken into possession all of said property and title
deeds to the lands.

Among other matters, the petitioners pray that the property
conveyed to Newell W. Crain be adjudged to belong to the

estate of the deceased ; that the same be inventoried as such, and for the appointment of a receiver, &c.

The conveyances to Newell W. Crain were dated, some in March, 1849, others in October and November, 1850.

Several special causes of exception were set down by defendants, viz : ·

1st. That the matters and things stated and set forth in said petition are cognizable only in the County Court.

2nd. That the action is premature, the administration on the estate not being closed, and the time for distribution of said estate not having arrived.

3rd. That the succession not being closed, and the estate being in the hands of the administrator, the plaintiffs have no right to the property of the succession, or to control the same so as to give them a right of action against the defendant Newell W. Crain.

4th. That the petition sets forth a state of facts which exhibits a full and clear title in the said Newell W. Crain to the property sued for in this action, and that acquired in a manner which affords the plaintiffs no legal right of complaint against him.

5th. Said petition shows no cause of action against the defendants or either of them.

The demurrer was sustained, cause dismissed, and the plaintiffs appealed.

The three first causes of exception will be considered together.

The principal point of importance, presented by them, is the exception to the jurisdiction of the District Court. Now it has been settled by repeated decisions, that the District Court is the proper tribunal to take cognizance of, and afford relief in, cases were fraud against their rights is charged by persons interested in an estate, and especially where there is a fraudulent collusion and combination between administrators and third parties, in derogation and to the injury of those

rights. This has been so often ruled, that in Purvis v. Sherrod it was said, that the question could no longer be regarded as an open one. (12 Tex. R. 159.) In Dobbin v. Bryan, (5 Tex. R. 276,) it was held that the District Court had jurisdiction to investigate and arrest fraudulent combination between an administrator and others, confederating to injure those interested in the faithful administration of the estate ; that both fraud and trust would authorize the exercise of original jurisdiction by the District Court ; that the Probate Court, from its limited powers, could not well investigate the facts constituting the fraud. (1 Tex. R. 177 ; 4 Id. 200–331 ; 9 Id. 113 ; 11 Id. 102.)

If, in this case, it should be urged that the combination, as charged, between the administratrix and Newell W. would not authorize the exercise of the jurisdiction of the District Court, on the supposed ground that the administratrix has no rightful authority to disregard the acts or sales, real or pretended, of the deceased, and that she cannot inventory the property so sold or conveyed as assets, and therefore could not be charged with unlawfully combining to defeat such inventory ; yet, the fraud perpetrated, as alleged, by the deceased, in the dispositions made of his estate, against the rights of the plaintiffs, would, irrespective of the misconduct of the administratrix, entitle them to seek relief in the District Court. Whether the administratrix could disregard these pretended bills of sale, the vendor or donor having always remained in the possession of the property ; or whether they were revocable by the deceased, it is not necessary in this place to consider. Admitting by way of argument, that they could not be repudiated by the deceased or his administratrix ; yet, forced heirs who, as charged, have been defrauded by these transactions, of their legitimate portions, may institute proceedings to have them set aside—as creditors may, to set aside deeds in fraud of their rights, though the rights of the two classes are very distinct and not to be confounded ; and it will not admit of question,

that to unravel, detect and adjudge upon such frauds, would require more extensive and searching powers than those entrusted to the Probate Court, and would especially invoke the aid of the Court of general jurisdiction. Again, the sales complained of by the plaintiffs, are in effect, represented as *inofficious wills in disguise*, in which the dictates of natural duty and of law have been alike disregarded. Now, had the deceased made these dispositions of his property by a will in fact, a controversy as to the validity of such will must have been prosecuted in the District Court; and were there no other ground for the exercise of such jurisdiction in this case, yet, by analogy, the validity of these sales should be determined by the same jurisdiction which would have acted upon them, had they been expressed in the form of a will.

As to the other grounds, that the action is premature, the succession not being closed, it is only necessary to say that the administratrix is a trustee, acting for the benefit of creditors and distributees, and that in cases where she will not or cannot act for the protection and preservation of the estate, the *cestui que trusts* have a right to act in the behalf and for the protection of their eventual interests, and that such rights are the proper subjects of judicial cognizance.

The great question or questions in the cause are suggested by the fourth exception, which is as follows, viz : That the petition sets forth a state of facts which exhibits a full and clear title in appellee, N. W. Crain, to the property sued for in this action, and that acquired in a manner which affords to the said plaintiffs no right of legal complaint against him.

Whether the conveyances and bills of sale were perfect in form or not ; whether they were delivered to the vendee or retained by the vendor, has not been specifically averred in the petition. Nor is the averment in relation to the delivery of the property definite or conclusive. True it is averred that there was no actual, *bona fide* delivery of the property to the vendee ; but it is also averred that if there was any delivery,

it was fictitious, formal and nominal, made with the under-
standing that the deceased should not part with the actual
possession of the property, but for the mere purpose of giving an
apparent sanction to the unlawful contracts between the de-
ceased and the said Newell. I shall therefore not inquire
whether title passed, as between the supposed or real vendor
and vendee ; whether the acts were binding on the said Am-
brose, and were complete as to the defendant Newell, or were
such as could have been enforced in a Court of Equity. Their
effect, as between the two parties to them, have not been spe-
cially discussed by the appellants, and waiving the considera-
tion of this point, we come to the important question whether
these conveyances and bills of sale are, in judgment of law,
fraudulent and void as against the plaintiffs.

In determining this question, these transfers are not to be
considered as they purport on their face to be, viz : convey-
ances on valuable consideration, but as mere voluntary dona-
tions of property by a father to one of his children, the posses-
sion and control of which property were retained by the donor
up to the time of his death, the transfers being mere contriv-
ances for the double purpose of enabling the donor to enjoy
the benefits of his property and its control during his life, and
yet to vest the whole in the donee at his death, in fraud of the
legitimate shares of the estate to which the plaintiffs, as forced
heirs, are entitled, and of which their parent could not deprive
them by any dispositions of his last will, or by donations in
his last sickness.

Such is the character and qualities of these acts, as repre-
sented by the petition and admitted by the demurrer ; and as
such they present themselves for examination and decision.

To determine whether these donations are void, as in fraud
of plaintiffs' rights through forced heirship, we must first as-
certain what those rights are ; and to judge of the force and
effect of the statutory provisions under which those rights are
claimed, it will be expedient to recur to the principles of our

Crain v. Crain.

former jurisprudence, a portion of which, with reference to this subject matter, has in effect been preserved and is embodied in our Statutes.

By the laws of Spain, the rights of forced heirs were amply secured, and restrictions, to a considerable degree, were imposed on the exercise of testamentary power ; and, as germain to the subject, it may be remarked that they have been imposed to a greater or less extent in almost "every nation under heaven." (2 Blackstone, 491.) Even in England, where the boast is of unlimited power of disposition in. the testator, a bequest for superstitious uses is void, although by the testator it may be deemed indispensible to his spiritual and eternal welfare. So any bequest creating a perpetuity, or deferring the enjoyment until there would be great accumulation of income, is unlawful, &c. Such bequests are prohibited, from a due regard to the public policy, maugre the proposition that the ownership of the property confers on a testator the right of free disposition. And, pursuing this train of observations, we may remark, that as the right to make a will and transfer property by bequest is not a natural right, but a creation of positive law, it may certainly be so regulated as to harmonize with the institutions and policy of the country, and especially so as to require one who can no longer enjoy his property, to so dispose of his acquisitions as to secure a portion for the comfort of those who by his agency were brought into the world, and for whose support he is bound by the dictates of natural duty, and the impulses of affection. And as the reasons for restrictions on testamentary power are expressed with great cogency and brevity in the following extract from Cooper's Justinian, (p. 486,) I shall cite it in its terms, viz : " When " we consider the many capricious, not to say senseless and " unjust dispositions of property, that take place in countries " where an unlimited right of devising is permitted, the neglect " of children and relations for the sake of gratifying a selfish " vanity or a death-bed superstition ; the culpable fondness of

" power, that would extend for a century or two, or perpetu-
" ate if possible the control of a weak and dying man, over
" property that he can no longer enjoy, as in the will of Mr.
" Thelluson ; when we consider further, that those whom we
" bring into existence, have a right to call upon us to make
" that existence as comfortable as we are able, without unrea-
" sonably sacrificing our own comforts, we shall probably in-
" cline to think that some restrictions on the right of devising
" are neither inexpedient nor unjust."

Recurring to the provisions of Spanish Law, it seems that
the principle on which the rights of heirs and restrictions on
testamentary power are based is, that if one attempts by vol-
untary dispositions to transfer his property, he is under a na-
tural obligation to make some provision for those who, if he
had made no will, would have been by law declared exclusive-
ly entitled to his property. The share of an estate to which
an heir was entitled, was called his legitimate portion ; and
he was denominated a forced heir, having by force of law a
paramount right to his share of the succession. Children were
forced heirs of their parents ; and the latter (unless there were
just causes for disinheriting the children) had not the capacity
either by donations *inter vivos* or by will, to dispose of more
than one-fifth of their property to strangers ; though, as among
the children, they had the power by gift or will to distribute
an additional one-third of their estate to one or more of their
children, excluding the others from their bounty. Children
who had no descendants could voluntarily dispose, in life and
at death, of only one-third of their property ; their parents, as
forced heirs, being entitled to the other two-thirds. Brothers
and sisters were entitled also to a portion of the property of a
deceased, who attempted to institute an infamous person as his
heir. Such was the law as it existed here in 1836. (*Vide*
Escriche Dicc. *Verbo* DONACION INOFICIOSA, LEGITIMA ; 1
White, 155.) There was, by Statute, in 1837, an important
modification of the law, declaring that thereafter legitimate

descendants alone should be considered as forced heirs, thus excluding ascendants and brothers and sisters from this category. (Hart. Dig. Art. 3251.) The law continued in this state until 1840, when the great body of Spanish law was repealed, including the provisions on the subject of forced heirship, legitimate portions, &c. Whether the amendatory Act of 1837, above cited, was lost by the repeal of the general law, of which it was a modification, as is contended by appellees, is not material, as it cannot, with due regard to the subsequent law, be construed to have a more extended operation, or give more enlarged rights to heirs, than can be claimed for them under the provisions of the Act concerning wills in 1840.

Under the 13th Section of this Act, (Hart. Dig. Art. 3263,) it is declared that no father or mother, by last will or testament, shall disinherit his children, except for cause specified in the Statute; it being declared by a subsequent Section, that the Act shall not be so construed as to prevent a parent from the free disposition of the one-fourth of his property by last will and testament, or by donation in last sickness.

It then appears, that by our former laws, and up to 1840, a parent could not, unless for just cause of disinherison, exclude a child by any voluntary donation, in his life time, to strangers, or by excessive donations to one or more of his children; nor could he, by dispositions of this character, in his last will, deprive his children of a certain share (fixed by law) in his estate. Neither in life nor at death, could he exclude them from their legitimate portion.

These provisions were retained but in part in the law of 1840. No restrictions were by that law imposed on the power of disposing of property by donation during the life of the owner; or, in other words and more accurately, by donations *inter vivos*. The restraints on the power of the owner to dispose of his property at pleasure, embrace only wills and donations in last sickness. By these he cannot bequeath more than

one-fourth of his property away from his children. But, as his right of disposition is not otherwise infringed for the benefit of his heirs, he may, in life, dispose freely of his property by donation, although the property may be thereby so squandered as to leave nothing for his heirs at his death, or to be disposed of by his will.

But the rights secured to heirs by the Statute were intended to be substantial benefits, not to be evaded by shifts or devices or donations, whether in fact or in form, which are intended and do operate as mere frauds on the law and on the rights of heirs under the law, and are such as to allow a man the control and benefits of his property during life, and to pass the property to a particular heir or stranger after his death, to the defeat of the rights which an heir could claim as against the will of the deceased ; and which, in fact, are but a will in disguise, without being subjected to the restrictions on dispositions by will. Whether the donations, in this case, are a fraud upon the Statute of wills, and consequently void as against the heirs, is the main point in this controversy. The question is novel, and from its decision we can derive no aid from Spanish or Civil Law Commentators ; for in those systems donations exceeding the disposable amount of a man's property are prohibited. These donations would be void *per se* under those systems, but their invalidity under our law must depend upon whether they can be fairly regarded as a fraud upon the Statute of wills. Our system, with reference to the rights of heirs, as against inofficious testamentary bequests, is more analogous to that of the custom of London, than to any other which has been suggested, and with propriety we may refer to the decisions on the rights of heirs under that custom, not as binding authority, but as the opinions and reasonings of Judges distinguished for learning and ability, on questions of the like character with the one under consideration.

Blackstone, in describing the custom, after stating that the power of bequeathing is coeval with the rudiments of the law,

says, in effect, that we are not to imagine this power of be-
queathing as extending originally to all of a man's personal
estate.   On the contrary, Glanvil will inform us that by the
Common Law, as it stood in the reign of Henry the Second, a
man's goods were to be divided into three equal parts : of
which one went to his heirs, or lineal descendant, another to
his wife, and the third was at his own disposal ; or if he died
without a wife, he might then dispose of one moiety, and the
other went to his children ; and so, *e converso*, if he had no
children, the wife was entitled to one moiety and he might be-
queath the other ; but if he died without either wife or issue,
the whole was at his own disposal.  The shares of the wife
and children were called their reasonable parts, and the writ
*de rationabili parte bronorun* was given to recover them.

This continued to be the law of the land at the time of
Magna Charta, which provides that the King's debts shall first
of all be levied, then the residue of the goods shall go to the
executor to perform the will of the deceased ; and if nothing
be owing to the crown, all the chattels shall go to the de-
ceased, except the reasonable parts of the wife and children.
In the reign of King Edward the Third, this right of the wife
and children was still held to be the universal or Common
Law, though frequently pleaded as the local custom of Berks,
Devon and other counties ; and Sir Henry Finch lays it down
expressly, in the reign of Charles the First, to be the general
law of the land.  But this law is at present altered by im-
perceptible degrees, and the deceased may now by will be-
queath the whole of his goods and chattels, though we cannot
trace out when this alteration first began.  Indeed Sir Ed-
ward Coke is of opinion that this never was the general law,
but only obtained in particular places by special custom.  (2
Blackstone, 491.)

Whether this ancient law was universal or confined to spe-
cial places, is not a matter of interest in this case, as we are
inquiring into that law only with reference to its analogy to

our law of wills. The similarity between the incapacities of testators and the rights of heirs, under the custom and under our Statute, is striking ; and the decisions on the custom, being on questions similar to those arising under our Statute, have relevancy, cogency and force, whether the law on which they were made be special or universal.

The first case which I shall examine is that of Hall v. Hall, 2 Vernon, 277. This case is with reference to the rights of a widow, but it applies here, as the widow has the same rights with children, under the custom. The plaintiff, a widow of a freeman of the city of London, brought her bill against the children to discover the estate, and have her customary part paid her. The defendants pleaded that their father, by deed executed in his lifetime, had given his goods to them. For the plaintiff it was insisted that such pretended deed was a fraud on the custom, and in truth was but in the nature of a will, the words being I give and devise. For the defendants, it was insisted it was not a will, but a deed, under hand and seal, and delivered as his act and deed. It was ruled by the Court, that if goods are absolutely given away by a freeman in his lifetime, this will stand good against the custom. But if he has it in his power by the keeping of the deed, &c., or if he retains the possession of the goods, or any part of them, this is a fraud upon the custom.

In Turner and Wife v. Jennings et al., a freeman of the city of London had, by deed executed in his lifetime, granted and assigned over the greatest part of his personal estate in trust for himself for life, and then for the benefit of his grandchildren, his son dying in his lifetime. The plaintiff, who married the freeman's daughter, brought the bill to set aside the deeds and to have his wife's orphanage part, in her right according to the custom of the city of London ; and although it was admitted that if the father had made an actual gift of any part of his personal estate to his grandchildren, in his lifetime ; or had actually given all to one child in his lifetime, that would have held good against the custom ; or if he had turned all his per-

sonal°estate into the purchase of lands, he might have disposed of it as he thought fit, yet it was decreed for the plaintiff and the deed set aside, for that the freeman had not entirely dismissed himself of the estate in his lifetime, and the deed being made when he was languishing and a little before his death, it ought to be looked upon as a *donatio causa mortis*, the Lord Chancellor declaring that either the custom must be entirely given up, or this deed must be looked upon as being made in fraud of the custom, but that it would stand good as to a moiety, which he, having no wife, might dispose of.

In a note to Hall v. Hall, *supra*, there is a reference to Edmundson v. Cox, 7 Vin. Ab. 202, in which it was held that an absolute gift by deed, but the deed not delivered, was a fraud upon the custom.

In Smith v. Fellows, (2 Atkins, 62, 377,) the deed for a term of 99 years, was in trust to permit the grantor to take the rents and profits during his life, then to assign the residue to his son, &c., in exclusion of the widow, and a bill by the widow to set this deed aside was sustained. The cases of Turner v. Jennings, and Hall v. Hall, were relied on, and the deed declared a plain fraud upon the custom.

In Tompkins v. Ladbroke, 2 Ves. Sr., 591, a freeman of London had executed a deed and a will. By the former he assigned 5000*l*., part of his personal estate, to the separate use of his daughter, but on trust that she should not have power to give it to her husband. At the time of making this deed he was about seventy-two, and afflicted with an asthmatic gout, and though he grew somewhat better, he died in two days after. The husband, in the lifetime of his wife, brought a bill to set aside the assignment. Two questions were considered :

1st. Whether a husband, for his own benefit, had a right to call in question an act by the father of his wife, as done in fraud of the custom, or whether this was confined to the child. And

2nd. Whether the .act of the father was a fraud upon the custom, against which he was entitled to be relieved.

Lord Chancellor Hardwicke decided both of these questions in the affirmative. As to the first, it was said, that not only the child, but any one standing in her right, as does the husband, could dispute the assignment ; that to hold the husband was not a proper person would destroy the whole faith and credit as to the custom of London ; that the inchoate right, if it might be so called, of the child of a freeman, to her reasonable part, in the lifetime of the father, was a ground of advancement of marriage, and if the father could, by a collusive act, vest that share in trustees for her separate use, it would destroy all faith of that kind ; that the husband had a consequential right, arising from the custom, contingently at first, and vested in him in right of his wife after her father's death. As to the second point, viz : whether it was a fraud upon the custom, the Chancellor considered that it was an act done by the father on his death bed, at the same time he made his will ; that there was no evidence of actual possession or effect of possession or enjoyment during the life of the father ; that the act was therefore in fraud of the custom, though not an actual fraud. The Chancellor was of opinion that if the father had lived he would have been entitled immediatly to receive the interest ; that it was a mere voluntary assignment of an equity, and passed no legal estate ; that if the father had lived and the daughter had brought a bill against him and the trustees to compel payment of interest, the Court would not decree it for her, being merely voluntary and *nudum pactum ;* that the case came very near to Hall v. Hall, for the securities remained in the hands of the father without being delivered up ; that one of the grounds of the decree in Turner v. Jennings was, that the deed being just before the death, must be regarded as a *donatio causa mortis,* and so was this to be considered, though not strictly so, and therefore a fraud upon the custom.

From these decisions it is apparent that, though under the excellent law or custom of England, an owner of personal property had the unlimited power of disposition by donation during his life, provided he entirely divested himself of the pro-

perty, delivering it up, with the securities of title, to the do-
nee, and the latter went into the actual possession, enjoyment
and control during the life of the donor, receiving the rents
and profits for his own benefit ; yet, if the donor was not di-
vested in fact, but retained the securities or property in his
possession, enjoyment or control, and if the property did not
in fact and substance, whatever may be the form, vest in the
donee during the life of the parent, but only after his death,
such donation was void as in fraud of the custom and the rights
of the heirs protected by that custom.   These decisions were
by some of the most enlightened Chancellors that ever adorned
the English Bench.   They were an application of equitable
principles to prevent the law and the rights claimed under it
from being prostrated by colorable acts, having the form and
semblance, but not the substance of right.   As said above, the
analogy between the custom and our statute is perfect.   In
both, the parent may give away, waste or destroy his property
during life.   But in both, he is incapacitated to bequeath the
whole from his children by his last will ; and in both the heirs
have the like capacities to receive an inchoate title, as it were,
to a share of the estate, during the life of the parent, to be
enjoyed at his death.   The reasons which induced the course
of decision in England, to preserve the custom from evasion,
require the like decision here, to protect the statute from pros-
tration.   They are decisions in analagous cases, and are as
applicable here as if they had been made on some Act of Par-
liament identical or analagous in its terms with our Act con-
cerning Wills.   Under the statute, the heirs are treated as
creditors *sub modo*, though their rights are distinct, and the
expression is only analagous, against whom a fraud may be
committed, and surely their rights are of as high a character
at least, as are the rights of heirs under the custom.   The
rights of heirs, under our Statute, to a portion of the estate of
a parent, are derived from a system which described this right
as a *non scripta sed nata lex*, as born, so to speak, with the

Vol. XVII.          7

human race ; as having preceded all constitutions, civil and
political, and as having been engraved by nature·on the hearts
of all parents.    (Escriche *verbo* LEGITIMA.)    The rights se-
cured by a law originating in such sentiments, cannot have
less cogency than rights by the custom.    But it is not neces-
sary that an heir should be regarded as a quasi creditor ·or
purchaser, in order to hold that a fraud may be committed
against him.    These are not the only classes against whom
fraud may be committed.    For instance, in countries where
the Common Law prevails in its rigor, with regard to marital
rights, where by marriage the civil existence and the per-
sonal property of the wife are absorbed in the husband, a fraud
may be committed against the husband, by a conveyance by a
wife of her property, made before marriage, even although
this property may be settled to her separate use.    Though at
the time of making such conveyance she is the absolute owner
of the property, and has the unlimited power of disposition
incident to ownership, yet a transfer made by her without the
knowledge of her intended husband, will be considered as a
fraud on his just expectations of acquiring the property of the
wife by marriage, and will be set side.    His rights were merely
contingent, dependent on a marriage which might never take
place ;   yet they are regarded by the law as having such effi-
cacy, that a fraud may be committed against them, by the con-
veyance of the wife, though at the time of such conveyance
she be the unqualified owner of the property.    (Countess of
Shathmore v. Bowes, 1 Ves. Jr. 22 ;  1 White's Equity Cases,
p. 269.)
    But there is a class of cases in which the assignments of
owners of property have been adjudged frauds against others,
which bear a closer analogy to the acts and rights of parties
in this case.   The first is that of Gregor v. Kemp, 3 Swanston,
404.   The mother had covenanted that by her last will, or
otherwise, she would give to John Kemp, &c., a fourth part of
all the real and personal estate she should be seized of or en-

titled to at her death. She conveyed by deed in her lifetime one thousand pounds to her daughters and grandchildren. The Court was of opinion that this disposition was in fraud of the articles; that Mrs. Kemp was not restrained from disposing of her estate in any way in her lifetime, with the single exception, that she was restrained from making a distribution on purpose to defeat the covenant. But if the disposition had not been made with the avowed design to defeat the articles, yet it should, under the circumstances, be regarded as a *donatio causa mortis*, otherwise articles of this nature would signify nothing, if they are to be eluded by a disposition a day or two before death. But the disposition was good to affect the remaining parts of the estate, and was ordered to be satisfied out of it. Here the covenant was to give the fourth part of such estate only as she was seized of at the time of her death ; and, literally, she was not at death seized of this one thousand pounds ; but the Court held that by collusion she could not defeat the covenant, and that she should, for the purposes of her covenant, be regarded as seized at her death of the property. The obligations of the Law of Wills, on parents, to leave three-fourths of their estate, possessed by them at their death, to their children, have as much force as the obligations of this covenant had upon Mrs. Kemp, to leave the one-fourth of her estate, at death, to the covenantee ; and they can be no more eluded or defeated by fraud in one case than in the other.

I shall next refer to Jones v. Martin, 5 Ves. 266, (in note.) By articles, T. Martin, the father of Mrs. Jones, covenanted, among other things, to leave her, at his decease, an equal share with her brother and sister, of all his personal estate, to be enjoyed immediately after the decease of himself and wife, and not before. He transferred, during life, all his personal estate to his son, except ninety pounds, which he directed by will to be divided according to the conditions of his covenant. The bill was filed by Mrs. Jones and her husband, against her

brother, for an equal distribution of the property that had been transferred to and received by him in the lifetime of his father. The property was in stock, and it was a question whether the father had completely divested himself of the property during his life. There was evidence of frequent declarations by the father, that he had transferred the stock to defendant, reserving only the dividends for his own life, and there was much other evidence. The Court was of opinion that the transfer was not complete; that such covenants did not confine the father's powers; that he might give scope to projects, or indulge in free and unlimited expense. But if he indulged in partialities between his children, and made a difference, he must do it directly, absolutely, and by an unqualified gift, surrendering all his own interest. He must give out and out. He must not exercise his power by an act which is to take effect, not against his own interest, but only at a time when his interest will cease. The case of Turner v. Jennings, *supra*, on the custom of London, was referred to and approved. It was said that the transfers to the son were a fraud upon the articles; that the property continued to answer all the father's purposes during life. If a father will be partial and give a preference, he must give it against himself, and not make a mere reversionary gift. He should immediately feel himself the poorer for the gift. If he is willing to suffer that, then let him yield to the impulse of his partiality. But if a father may effectuate his purpose by any thing short of this, it will furnish perpetual opportunity for subterfuge and scheme to defeat and defraud these covenants, which ought to be most honorably observed.

In Fortescue v. Hennal, 19 Ves. 67, the father covenanted for an equal division, at his death, of all the property he should die seized and possessed of, between his two daughters or their families; held, that though he retained the power of free disposition by act in his life, yet he could not defeat the covenant by a disposition, in effect, testamentary, as by reserving

to himself an interest for life. The Master of the Rolls said that he could not defeat the covenant by testamentary act, and the question was whether he could defeat it by acts which, though not testamentary, were not to take effect until after his death ; that such a covenant would be of little value, if its effect were to depend on the form of the instrument. Against a diminution of his property in his lifetime, his own interest and convenience form a pretty good security. Not so where, without any diminution of his enjoyments, he exercises a merely posthumous bounty, through an irrevocable instrument ; that the custom of London, like this covenant, attached only upon the property which the freeman has at his death. During his life he has full liberty to dispose of his property, in any manner he thinks fit ; yet it has been held, a disposition by a freeman, that is not to take effect until after his death, though by an irrevocable instrument, is a fraud upon the custom.

The conditions of the covenants in the above cases, are in strict analogy with the provisions of our Statute of wills, securing the distribution of the estate which a parent dies seized and possessed of at his death, among his children ; and the decision upon these covenants carefully guarding, as they do, the right of free disposition of property, but at the same time vigilantly repressing frauds against the covenantee, are entitled to very great weight and consideration when similar questions are presented under our statute.

It is not necessary to repeat here the circumstances under which the conveyances in this case were made, or their conditions and reservations, as represented in the petition. They were not intended to be of any force during the life of the parent, but that he should retain the control and enjoyment of the property until his death, and that the property should, by operation of the deeds, then vest in the son. Whether such conveyances as these be tested by original principles, or by the decisions in analagous cases, which have been just examined, it seems that they should be held void, and as in fraud

of the law securing appellants a portion of their father's estate. It is unfortunate that a question of this character should have come up on demurrer. The conveyance, or some of the earlier only may, on proof, be found not obnoxious to the charges against them in the petition. But this decision is on the facts as they are presented, and not as they may appear subsequently in proof. Having examined the points material to the decision of this cause, and being of opinion that the judgment sustaining the demurrer to the petition was erroneous, it is ordered that the judgment be reversed, and the cause remanded for further proceedings.

Reversed and remanded.